**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| E & T ELECTRIC LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24 CV 1192 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| OFLC CERTIFYING OFFICER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us are Plaintiff's objections to Magistrate Judge Jantz's Report and Recommendation dated March 14, 2024. (Pl.'s Obj. to Report and Recommendation ("Objs.") (Dkt. No. 13).) Magistrate Judge Jantz recommends that Plaintiff's motion for a preliminary injunction be denied. (Report and Recommendation ("R & R") (Dkt. No. 11).) For the following reasons, we overrule Plaintiff's objections, adopt the R & R, and deny Plaintiff's motion for a preliminary injunction.

**BACKGROUND**

Plaintiff, E & T Electric LLC, is an industrial and commercial electrical-services company headquartered in Colorado. (Compl. (Dkt. No. 1) ¶ 2.) In early December 2023, it entered into a contract to provide electrical services to an entity called America's Heartland Packing, LLC ("Heartland"), which is building a beef-processing plant in Missouri. (*Id.*, Ex. A (Dkt. No. 1-3) at 6, 29-43.) Because the contract is "large" and involves a purchase order of over $6 million, Plaintiff determined that it needed to hire additional workers. (Compl. ¶ 17.)

To address this need, Plaintiff submitted an application (the "Application") on December 26, 2023 to the Defendant United States Department of Labor's ("DOL") Office of Foreign Labor Certification ("OFLC") for a temporary employment certification to secure non-agricultural foreign labor through the H-2B visa program. (*Id.* ¶¶ 4, 16.) The program is administered in part by the DOL and in part by the Department of Homeland Security ("DHS") and its United States Citizenship and Immigration Services ("USCIS"). *Kiewit Offshore Servs. v. U.S. Dep't of Lab.*, No. 4:22-cv-03716, 2023 WL 5599003, at *1 (S.D. Tex. Aug. 29, 2023). "To begin the H-2B process, an employer must first secure a temporary labor certification from the DOL" by submitting an application, which requires the employer to show that "it has tried, but failed, to fill positions with workers from the United States and that this country's workers will not be adversely affected by filling the positions with H-2B workers." *Id.* Once the DOL grants an employer's request for temporary labor certification, the employer can proceed to seek approval from USCIS for the foreign workers' visa eligibility and then apply for a visa from the Department of State. *Id.*

In its Application, Plaintiff stated that in addition to its staff of 36 workers, 23 of whom were permanent, it sought to employ 12 "Helpers–Electricians" to fulfill the Heartland contract. (Compl., Ex. A, at 7.) According to Plaintiff, its temporary need for workers arose from the Heartland contract, which was a "one-time occurrence"—specifically, a "temporary event of short duration"—terms that are used in a relevant federal regulation, 8 C.F.R. § 214.2(h)(6)(ii)(B)(1). (*Id.*)

On January 3, 2024, the OFLC's Certifying Officer ("CO") issued Plaintiff a Notice of Deficiency, which stated that Plaintiff's Application "fail[ed] to meet the criteria for acceptance" for two reasons: Plaintiff had not "establish[ed] the job opportunity as temporary in nature" under other relevant federal regulations, 20 C.F.R. § 655.6(a) and (b), nor had it "establish[ed a]

temporary need for the number of workers requested." (*Id.*, Ex. A, Notice of Deficiency, at 180, 183, 185.) As to the first deficiency, the CO elaborated:

> The employer[-]submitted documents did not establish a temporary need. The employer's explanation and documentation did not substantiate how the contract is unique or different and over and above the employer's normal workload. The employer did not establish what temporary event of short duration created the need for a temporary worker. Securing a contract for "a huge electrical contract order for one of the process area [sic] rendering in a new factory facility" does not create a temporary need. The employer's need for workers may vary depending on the timing and scope of the individual contracts that it secures. The employer must establish that that its need is temporary in nature, regardless of whether the underlying job is permanent or temporary.

(*Id.* at 184 (sic in original).) Plaintiff was given the opportunity to submit additional information and documentation.

On January 17, 2024, Plaintiff responded to the Notice of Deficiency with documentation and a written statement, in which it said, among other things, that its need for temporary workers was "the result of an extraordinary one[-] time occurrence, that is being [sic] a massive contract provided to them [sic] on a one-time basis which dwarfs all of the contracts it is [sic] previously entered into." (*Id.* ¶ 19; Ex. A, Pl.'s Resp. Notice of Deficiency, at 187.) Plaintiff further stated:

> E & T Electric maintains a full[-]time staff of permanent employees who almost all are currently employed now and well into 2024 on ongoing projects. Like almost all companies in the electrical contracting field E & T Electric works contract to contract, but normally the permanent staff is sufficient to carry this load. Occasionally, however, this staff must be augmented by temporary workers when a particularly large project appears which is above and beyond the Company's current capacity. Since this project has been calculated to require 25 workers, we now have a temporary need for [an] additional 12 H-2B workers, lasting 9 months, from March 11, 2024 to December 10, 2024. This is only the second time in the Company's 20[-]year history that it have [sic] had to petition for H-2B workers, and both times it was a result of a temporary event of short duration.
> . . .
> The employer currently employs 32 number [sic] of permanent workers to perform the services or labor and anticipates recruiting 10 more in the near future. Nevertheless, a temporary event of short duration, namely[,] six contracts which it has concurrently entered into with [Heartland,] has overwhelmed the ability of the [sic] E & T to provide the necessary services with [its] permanent staff, and so, has

created a need for 12 temporary workers. These workers will be temporary because they will only work on this one[-]time contract and not become a part of the employer's permanent staff, since they are need[ed] only for the length of the [Heartland projects,] specifically the portion pertaining to the rendering of electrical motors and controls which is scheduled to be completed at the end of this year. Their services will not be needed after that because no more similar projects can be expected, in that the 6 contracts were all obtain[ed] in connection with an extraordinary one[-]time event, [Heartland's] construction of a new plant.

. . .

[The Heartland] projects will generate over $17 million in revenues, and require 67,734 man-hours. This is over 8 times the employer's largest project in terms of revenues since 2021 and 4 times as many man-hours. Nor is this a phenomena [sic] which can be expected to repeat itself, because, again all of this work is being done for a new plant [Heartland] is building. Building this plant is an extraordinary one-time occurrence which they have no reason to expect will reoccur in the foreseeable future.

(*Id.* at 188-190.)

On February 7, 2024, the CO issued a Final Determination denying Plaintiff's Application on the ground that Plaintiff had failed to establish that its need for labor was temporary as a "one-time occurrence" within the meaning of 20 C.F.R. § 655.6(a) and (b). (*Id.*, Ex. A, Final Determination, at 418-27.) The Final Determination included a detailed explanation of the bases for the denial, stating in part:

. . . The employer explains that [the Heartland] project is outside of its normal business operations due to the construction of this plant generat[ing] over eight times the revenue of its largest project since 2021, at $17 million, and due to the aforementioned project requiring four times the manhours of its largest project since 2021, at 67,734 man-hours.

. . .

However, the employer has also explained that its business normally works contract to contract. Despite the size of the contracted project with [Heartland], this project appears to be within the scope of the services the employer provides. Based upon the employer's statement on page 2 of its [Notice of Deficiency] response document, its business is in the electrical contracting field, and thus the employer's business practice appears to be contingent on securing and fulfilling contracts. Therefore, the employer appears to have a permanent, ongoing need for workers, even though its contracts and projects may be of a limited duration.

Securing a contract for electrical construction services does not create a temporary need. In particular, it does not create a one-time need. Although the employer is

4

attesting that the construction of a new power plant is an extraordinary one-time occurrence due to it being a large project, which it has no reason to expect will reoccur in the foreseeable future, the employer is reminded that its need for workers may vary depending on the timing and scope of the individual contracts that it secures. As a result, there is no guarantee that the employer will not have opportunities for large electrical construction projects in the future.

. . .

. . . Additionally, the employer's statement that "[o]ccasionally, however, this staff must be augmented by temporary workers when a particularly large project appears which is above and beyond the Company's current capacity," does not indicate that the employer's need to augment its staff is a one-time or unique occurrence.

. . .

. . . The payroll summary shows the employer has permanent workers year-round and had temporary workers starting in October 2022 through October 2023. The employer stated that "[t]his is only the second time in the Company's 20-year history that it [has] had to petition for H-2B workers, and both times it was a result of a temporary event of short duration," which does not help establish a one-time occurrence. The employer clearly has employed workers to perform the services or labor in the past and will need workers to perform this in the future. Furthermore, since the employer has temporary workers "who will be terminated when their current projects are completed" and has previously petition[ed] for foreign workers with the Department, it does not establish that the employer's need is unique or establish how it is above and beyond the employer's normal business operations. Lastly, the employment of temporary workers for a year, from October 2022 to October 2023, is contrary to the employer's statement that this new project with [Heartland] and its need for temporary workers for 9 months is not within the employer's normal business model, when the payroll demonstrates it has employed temporary workers for a period of one year.

. . .

[I]t remains unclear how the employer can state that providing such workers in the stated industry for one project is not part of its business model when meeting its client's employment needs, regardless of the occupation, appears to be the center of its business model. Therefore, it does not appear that this contract/project represents a unique event in its business operations. The employer is in the business of seeking, securing, and implementing construction projects on an on-going basis, regardless of the size or requested occupation of the project. The employer's explanation that this project is much like the example of a shipbuilder found in Exhibit 11 of the [Notice of Deficiency] response, is incorrect. The [DOL] clearly indicates following the example that "the [DOL] would not consider it a one-time occurrence if the same employer filed serial requests for H–2B workers for each ship it built." The employer's business model is based on obtaining multiple projects, and therefore cannot establish a one-time need by focusing on only one of many such contracts. Unlike the hypothetical example of a shipbuilder, the employer failed to provide sufficient supporting documentation to clearly demonstrate to the Department how this project is above and beyond the scope of the employer's operations and workload.

5

>Although the employer has submitted copies of purchase orders, contracts, and a summary of all projects in the area of intended employment, these documents simply establish that the employer has work that it is currently contracted to perform and establishes that it has performed electrical construction work in the past. The aforementioned documentation also provides the size of the current project and the size [of] projects for the previous three calendar years. However, the employer's copies of purchase orders, contracts, and its summary of all projects in the area of intended employment from 2021-2024 does not establish that the project with [Heartland] represents a unique event above and beyond the scope of its business operations and workload. Therefore, said project does not establish that it is a unique non-recurring situation of short duration, that has created a one-time need for temporary workers.

(*Id.* at 424-27.)

Plaintiff filed the instant action on February 12, 2024. It alleges that the CO's denial of its request for temporary-labor certification violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). (Compl. at 1, 10, 13, 15.) On February 14, Plaintiff moved for a preliminary injunction ordering the CO to set aside the Final Determination and issue a Notice of Acceptance. (Dkt. No. 3.) We referred the motion to Magistrate Judge Jantz. (Dkt. No. 9.) After briefing, Magistrate Judge Jantz issued an R & R recommending that we deny Plaintiff's motion. (R & R at 1, 14-15.) Plaintiff then filed objections to the R & R under Federal Rule of Civil Procedure 72(a). The objections are fully briefed.

## DISCUSSION

### A.    Legal Standards

We review Magistrate Judge Jantz's R & R *de novo*. Fed. R. Civ. P. 72(b)(3). *De novo* review requires us to consider "all of the available information" and "decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). After conducting our review, we may "accept, reject, or modify the recommended disposition;

receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (internal quotation marks and citation omitted). A "[d]etermination of whether a movant is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Id.* (quoting *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021)). If the movant makes this showing, we move on to consider the irreparable harm the nonmovant will suffer if preliminary relief is granted, balancing it against the movant's irreparable harm if relief is denied, as well as the public interest. *Id.*

Plaintiff's challenge to the denial of its Application is brought under § 706(2)(A) of the APA, which requires that an agency's decision be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 853 (7th Cir. 2009). Plaintiff contends that the CO's decision was not in accordance with the law. (Compl. at 10-11, 13, 15; Pl.'s Mem. Law Supp. Pl.'s Mot. Preliminary Inj. (Dkt. No. 3-1) at 2, 6, 16, 19, 21; Objs., *passim*.) The scope of our review is narrow, and we are not to substitute our judgment for that of the agency; nevertheless, the agency must examine the relevant material and articulate a satisfactory explanation for its decision that draws a rational connection between the facts found and the decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *Nat'l*

*Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 75 F.4th 743, 749 (7th Cir. 2023) (a court reviewing agency action under the APA "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision") (citation omitted); *Madison v. U.S. Dep't of Labor*, 924 F.3d 941, 946 (7th Cir. 2019). While we "may not supply a reasoned basis for the agency's action that the agency itself has not given," we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citations omitted).

**B.      Magistrate Judge Jantz's R & R**

After reviewing the relevant facts and legal standards, Magistrate Judge Jantz determined that the CO's decision was not arbitrary, capricious, or contrary to law, and therefore Plaintiff is not likely to succeed on the merits of its claims. Accordingly, she recommends that we deny Plaintiff's request for a preliminary injunction.

**C.      Plaintiff's Objections**

Plaintiff argues that the R & R was erroneous for six reasons.

**1.      First Objection**

When setting out the applicable regulatory and statutory framework for the issuance of H-2B visas, Magistrate Judge Jantz stated as follows:

> The relevant regulation – jointly issued by the DOL and Department of Homeland Security – governing the issuance of H-2B visas in this case is 8 C.F.R. § 214.2(h)(6)(ii). Subsection A of that regulation defines what qualifies as "temporary services or labor" as follows: "[t]emporary services or labor under the H–2B classification refers to any job in which **the petitioner's need for the duties to be performed by the employee(s) is temporary, whether or not the underlying job can be described as permanent or temporary**." 8 C.F.R. § 214(h)(6)(ii)(A) (emphasis added). "The employer must establish that the need for the employee will end in the near, definable future," and "[t]he petitioner's need for the services or labor shall be a one-time occurrence, a seasonal need, a peak

8

load need, or an intermittent need." 8 C.F.R. § 214.2(h)(6)(ii)(B). The requirements of Subsection A and Subsection B must both be met for the DOL to issue a labor certification: "an employer seeking certification has the burden of showing its need for workers is temporary **_and_** that the request is a one-time occurrence, seasonal, peakload, or intermittent need." *Kiewit Offshore Servs v. United States Dept. of Labor*, Civil Action No. 4:22-cv-3716, 2023 WL 417486, at *4 (S.D. Tex. Jan. 25, 2023) (emphasis added).

(R & R at 6.)

Plaintiff first asserts that the R & R (as well as the CO's decision) is premised on the "fundamental" error that an employer must establish both that its need for workers is temporary *and* that its request is a one-time occurrence, seasonal need, peak load need, or intermittent need. (Objs. at ECF Pg. No. 2.) According to Plaintiff, this approach under 8 C.F.R. § 214.2(h)(6)(ii)(B) is "directly contrary to" 20 C.F.R. § 655.6(b), which states that the need of an employer seeking certification for non-agricultural labor under the H-2B visa program "is considered temporary if justified to the CO as one of the following: A one-time occurrence; a seasonal need; a peakload need; or an intermittent need, as defined by DHS regulations." (*Id.*) In Plaintiff's view, "if an employer's need fits the regulatory definition of a one-time occurrence" in § 655.6, "it is by definition a temporary need, and the [R & R's]—and *Kiewit*'s—conclusion to the contrary is dead wrong." (*Id.* (emphasis omitted).)

The trouble with Plaintiff's interpretation of § 655.6(b) is that it ignores the immediately preceding subsection, which states: "An employer seeking certification under this subpart must establish that its need for non-agricultural services or labor is temporary, regardless of whether the underlying job is permanent or temporary." 20 C.F.R. § 655.6(a). The regulation *then* proceeds to state in subsection (b) that a need is considered temporary if "justified to the CO" as a one-time occurrence or one of the other options. When the subsections are read together, which is the proper interpretive approach, they convey that an employer must show that its need for workers is

temporary *and* that the nature of the need fits one of the categories listed in subsection (b). To put it another way, subsection (b) sets out one requirement for establishing a temporary need, but it does not indicate that satisfying one of the listed categories is sufficient *by itself* to make this showing. Plaintiff's reading of § 655.6 violates canons of statutory construction by both ignoring subsection (a) and rendering it superfluous. *See, e.g.*, *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 714 (7th Cir. 2014) (observing that statutory interpretation is guided not just by a single sentence, but by the language of the whole law, and courts must reject any statutory interpretation that renders terms superfluous); *Water Quality Ass'n Emps.' Benefit Corp. v. United States*, 795 F.2d 1303, 1307 (7th Cir. 1986) (it is improper to read various subparts of a regulation or statute in isolation; rather, courts must consider all subparts in harmony).

Plaintiff's myopic construction of § 655.6 also disregards the language and structure of 8 C.F.R. § 214.2, which elaborates as follows on the showing an employer must make to obtain H-2B certification:

(ii) Temporary services or labor—

(A) Definition. Temporary services or labor under the H-2B classification refers to any job in which the petitioner's need for the duties to be performed by the employee(s) is temporary, whether or not the underlying job can be described as permanent or temporary.

(B) Nature of petitioner's need. Employment is of a temporary nature when the employer needs a worker for a limited period of time. The employer must establish that the need for the employee will end in the near, definable future. Generally, that period of time will be limited to one year or less, but in the case of a one-time event could last up to 3 years. The petitioner's need for the services or labor shall be a one-time occurrence, a seasonal need, a peak load need, or an intermittent need.

(1) One-time occurrence. The petitioner must establish that it has not employed workers to perform the services or labor in the past and that it will not need workers to perform the services or labor in the future, or that it has an employment situation that is otherwise

permanent, but a temporary event of short duration has created the
need for a temporary worker.

8 C.F.R. § 214.2(h)(6)(ii). This subsection clearly provides that a petitioning employer must

demonstrate not only that its need is a one-time occurrence, seasonal need, peak load need, or

intermittent need, but also that the need is "for a limited period of time" in that it "will end in the

near, definable future"—in other words, that it is temporary. As Magistrate Judge Jantz correctly

explained, R & R at 9 n.3, whether the need is temporary and whether it is caused by a one-time

occurrence are thus two separate requirements. *See also Kiewit*, 2023 WL 5599003, at *4.

Therefore, Magistrate Judge Jantz and the CO accurately discussed the requirements of the H-2B

program regulations.

### 2. Second Objection

Magistrate Judge Jantz observed that "even if the electrician helper jobs Plaintiff wants to

fill with H-2B visas and this particular large project are temporary, the CO found that the contract-

to-contract nature of Plaintiff's business would create consistent churn and a permanent need to

fill jobs with electrical helpers, such that the *need* was not temporary, and 'need' is the operative

part of the statute." (R & R at 9-10.) She concluded that the CO reasonably found that Plaintiff's

Application failed to satisfy the requirement set forth in § 214.2(h)(6)(ii)(A) that the employer's

need be temporary, and explained that this ruling was "consistent with [Board of Alien Labor

Certification Appeals, or BALCA] decisions finding that companies seeking to hire H-2B visa

workers because of a larger-than-usual contract have a permanent need for workers and cannot

satisfy the definition of 'temporary need' because of the contract-to-contract nature of their

business model." (*Id.* at 10.)

Plaintiff contends that Magistrate Judge Jantz and the CO interpreted § 214.2(h)(6)(ii)(A)

to "disqualify any employer with a permanent ongoing need for workers from establishing a

temporary need" and thus ran afoul of § 655.6(b). (Objs. at ECF Pg. No. 3.) We have rejected Plaintiff's strained interpretation of § 655.6(b). Furthermore, Plaintiff proceeds from an incorrect premise. The CO did not apply the regulation so as to disqualify *any* employer with an ongoing need for workers from establishing a temporary need. Rather, the CO simply reviewed the materials Plaintiff provided in support of its Application and determined that they failed to demonstrate that a "one-time occurrence" existed for Plaintiff. Those materials showed that Plaintiff had hired temporary workers from October 2022 through October 2023 and had applied once before for H-2B worker certification. The CO also highlighted Plaintiff's own statement in its response to the Notice of Deficiency that it "[o]ccasionally" had to "augment[]" its staff with temporary workers for "particularly large" projects, and the CO reasonably explained that this rationale did not demonstrate a need based on a one-time occurrence. (Final Determination at 425.) We agree with Magistrate Judge Jantz that "[i]t is reasonable to decide that these facts paint the picture of a company that has a recurring need for workers as it goes from contract to contract, and the need for these workers is not the result of a temporary event of short duration." (R & R at 12.)

### 3. Third, Fourth, and Fifth Objections

As discussed above, when rejecting Plaintiff's argument that its contract with Heartland created a "one-time need" for labor, the CO observed that Plaintiff's need for workers varies depending on the timing and scope of the contracts it secures and that there is "no guarantee" that Plaintiff "will not have opportunities for large electrical construction projects in the future." (Final Determination at 425.) Magistrate Judge Jantz quoted this portion of the CO's ruling (among several others) when concluding that the CO discussed all relevant portions of § 214.2(h)(6)(ii)(B)(i). (R & R at 11 n.4.)

12

In its third objection to the R & R, Plaintiff maintains that because "no employer can 'guarantee' what type of business it may have in the future, imposing such an impossible requirement is arbitrary and capricious." (Objs. at ECF Pg. No. 6.) The CO's reference to a "guarantee" may have been somewhat inapt, but it is clear that the CO was not imposing any impossible requirement on Plaintiff. As Defendant points out, (Def.'s Resp. Objs. (Dkt. No. 15) at 12), the CO was merely explaining that Plaintiff's characterization of the Heartland contract as a one-time occurrence due to its size was not by itself enough to establish a temporary need for foreign workers when Plaintiff's business model depends on a succession of such variable contracts. Given the plain language of the relevant regulations, that reasoning was sound.

In its fourth objection, Plaintiff makes the related argument that the DOL's final rule interpreting and providing guidance on the regulations at issue here "refut[es] any claim that an employer must be able to guarantee it will not have similar temporary needs in the future as a condition of temporary labor certification." (Objs. at ECF Pg. No. 7.) Those comments provide in pertinent part:

> Under current procedures, the employer must demonstrate that its need for the services or labor is temporary as defined by one of four regulatory standards: (1) A one-time occurrence; (2) a seasonal need; (3) a peakload need; or (4) an intermittent need. 8 CFR 214.2(h)(6)(ii)(B). The employer or its authorized representative must currently submit to the [State Workforce Agency having jurisdiction over the area of intended employment] a detailed statement of temporary need and supporting documentation with the application for H-2B labor certification. Such documentation must provide a description of the employer's business activities and schedule of operations throughout the year, explain why the job opportunity and the number of workers requested reflects its temporary need, and demonstrate how the employer's need meets one of these four regulatory standards.
> . . .
> DHS regulations at 8 CFR 214.2(h)(6)(ii)(B) provide that a petitioner's need be one of the following: (1) A one-time occurrence, in which an employer demonstrates it has not had a need in the past for the labor or service and will not need it in the future, but needs it at the present time . . . .
> . . .

13

> [T]he long-established definition of one-time occurrence . . . encompasses both unique non-recurring situations but also any "temporary event of a short duration [that] has created the need for a temporary worker." For example, an employer could utilize the H-2B program to secure a worker to replace a permanent employee who was injured. Further, if that permanent employee, upon returning to work, subsequently suffered another injury, the same employer could utilize the H-2B program again to replace the injured employee on the basis of a one-time occurrence. A one-time occurrence might also arise when a specific project creates a need for additional workers over and above an employer's normal workforce. For example, if a shipbuilder got a contract to build a ship that was over and above its normal workload, that might be a one-time occurrence. However, the Department would not consider it a one-time occurrence if the same employer filed serial requests for H-2B workers for each ship it built.

Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 78,020, 78,020-21, 78,025-26 (Dec. 19, 2008). Plaintiff submits that this guidance "unmistakably shows that the DOL might consider it such a one-time occurrence if the shipbuilder filed requests for H-2B workers for *some* of the ships it builds in the future, thus refuting any claim that an employer must be able to guarantee it will not have similar temporary needs in the future as a condition of temporary labor certification." (Objs. at ECF Pg. No. 7.)

As explained above, when the CO's reasoning is read in context, it is evident that the CO was not requiring Plaintiff to "guarantee" generally that it would not have opportunities to enter into large electrical projects in the future. Rather, the CO simply determined that Plaintiff, unlike the hypothetical shipbuilder, had not demonstrated that the Heartland project created a need for additional workers over and above Plaintiff's normal workforce. It is noteworthy that the DOL's guidance provides that the shipbuilder's situation "might," not "would," constitute a "one-time occurrence." That language reflects the fact-dependent nature of the inquiry. We agree with Magistrate Judge Jantz that the CO made a "viable distinction" between Plaintiff and the hypothetical shipbuilder in that the evidence showed that Plaintiff had previously augmented its

staff with temporary workers when confronted with a large project, and Plaintiff itself, significantly, had disclosed that "[o]ccasionally," it enters into a contract "that is over and above its normal workload," "just like" the Heartland contract. (R & R at 13-14 (citing Final Determination at 422, 425-26).) The CO quite rationally concluded that the Heartland contract did not qualify as a one-time occurrence under the regulations because it "represented a standard fluctuation" in Plaintiff's workload that could vary depending on the contract and had already required the hiring of temporary workers in the past. (*Id.* at 14.)

Plaintiff likewise relies on the shipbuilder example in its fifth objection, arguing that Magistrate Judge Jantz erred in stating that if foreign labor is intended to increase the size of an employer's existing workforce, even temporarily, there is no "one-time occurrence," (R & R at 13 n.5 (quoting a BALCA decision, *In re M & L Cleaning Servs. II, LLC*, 2023-TLN-00064, at 4 (Apr. 4, 2023)).) According to Plaintiff, this statement is "directly contrary" to the DOL's shipbuilder example because that scenario "[c]ertainly" involves a temporary increase in the size of the shipbuilder's existing workforce. (Objs. at ECF Pg. Nos. 10-11.) We disagree. The observation is shorthand for the reasonable inference from the regulations and guidance that an employer using a contract-to-contract business model cannot establish a truly temporary need merely by focusing on one contract and characterizing it as a "one-time occurrence." Reading the regulations and guidance as a whole, it is apparent that a "one-time occurrence" is not defined as expansively as Plaintiff claims. Furthermore, Plaintiff continues to overread the shipbuilder hypothetical, which by its plain terms refers to nothing more than a *possibility* of establishing a one-time occurrence.

4.      **Sixth Objection**

In its sixth and final objection, Plaintiff asserts that Magistrate Judge Jantz erred when she found reasonable "the CO's finding that the mere fact that [Plaintiff] has made more than one request for H-2B workers means its need is not temporary."[1]  (Objs. at ECF Pg. No. 9.)  But Plaintiff mischaracterizes the CO's finding, which was not based solely on this aspect of the evidence.  In addition to Plaintiff's previous request for H-2B workers, the CO also considered the following factors: Plaintiff's acknowledgment that it must "occasionally" augment its workforce when it takes on a large project, which undermined its contention that the Heartland project constitutes a one-time occurrence; Plaintiff's failure to submit data in an organized format that allowed the CO to easily discern how the Heartland project differed from previous projects; Plaintiff's failure to submit payroll data that was comprehensive and in the format requested by the agency; the payroll data that was submitted revealed that Plaintiff had recently used temporary workers for the year between October 2022 and October 2023; Plaintiff indicated that it had temporary workers who would be terminated when their current projects were completed; the type of electrical construction work being performed for the Heartland contract was not new to Plaintiff's business operations because Plaintiff has performed plant expansion work from time to time on a smaller scale; and Plaintiff's purchase orders, contracts, and summary of projects in the area of intended employment did not establish that the Heartland project was a unique event in its business operations.  (Final Determination at 425-27.)  We see no reason to question Magistrate Judge Jantz's conclusions that it was therefore reasonable for the CO to decide that the Heartland project was not above and beyond Plaintiff's normal workload and thus does not qualify as a "one-

---

[1]      Plaintiff also revisits in its sixth objection its previous arguments about the shipbuilder hypothetical and the "guarantee" language; they are rejected for the reasons discussed above.

time occurrence" under the relevant regulations and guidance and that as a result it is unlikely that Plaintiff will succeed on the merits of its APA challenge.

## CONCLUSION

We overrule Plaintiff's objections, adopt Magistrate Judge Jantz's Report and Recommendation, and deny Plaintiff's motion for a preliminary injunction [3].

The status hearing set for June 13, 2024 is stricken and reset to July 18, 2024 at 10:30 a.m. The parties are directed to submit a joint status report by June 24, 2024. The status report should include an agreed proposal for all further proceedings in this case, including a proposed schedule; whether the parties unanimously consent to proceed before the Magistrate Judge; and any other information that the parties believe is pertinent to our understanding of the status of the case. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Date: June 5, 2024